IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

WILLIAM SAUNDERS,　　　　　　)
　　　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　v.　　　　　　　　　　　)　　　Civil No.  3:15v006 (HEH)
　　　　　　　　　　　　　　　　　)
CAROLYN W. COLVIN,　　　　　　)
Acting Commissioner of Social Security,　)
　　　　Defendant.　　　　　　　　)
_____)

## REPORT AND RECOMMENDATION

William Saunders ("Plaintiff") is thirty-two years old and previously worked as a cashier,

a cook, a sales associate, a delivery driver and a paraprofessional at a group home.  On October

28, 2011, Plaintiff applied for Social Security Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability

from above-the-knee amputation of his right leg, hypertension and diabetes, with an alleged

onset date of August 24, 2011.  Plaintiff's claims were denied both initially and upon

reconsideration.  On September 3, 2013, Plaintiff (represented by counsel) appeared at a hearing

before an Administrative Law Judge ("ALJ").  The ALJ subsequently denied Plaintiff's claims in

a written decision on October 18, 2013.  On November 10, 2014, the Appeals Council denied

Plaintiff's request for review, rendering the ALJ's decision the final decision of the

Commissioner of Social Security.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in finding that Plaintiff's condition failed to meet listing § 1.05B, in

determining Plaintiff's residual functional capacity ("RFC"), in assigning great weight to the

state agency physicians' opinions and in failing to obtain an updated consultative examination.

The parties have submitted cross-motions for summary judgment that are now ripe for review.

Having reviewed the entire record in this case, the Court is now prepared to issue a Report and

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).[1]  For the reasons that follow, the Court

recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) and Motion for

Remand (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No.

15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.   BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history,

relevant medical records, state agency physicians' opinions, function report, hearing testimony

and vocational expert ("VE") testimony are summarized below.

A.  Education and Work History

Plaintiff completed high school.  (R. at 199.)  Plaintiff obtained a commercial driver's

license in 2006.  (R. at 33.)  Plaintiff previously worked as a cashier/cook, a sales associate, a

delivery driver, and as a paraprofessional in a group home.  (R. at 199.)

B.  Medical Records

On August 2, 2011, Plaintiff presented to Community Memorial Health Center with

complaints of pain in the right foot and right ankle after he fell at home.  (R. at 274.)  Rahul

Wadnerkar, M.D. ordered x-rays that revealed no evidence of fracture or misalignment of his

bones, osteomyelitis or any other diagnostic finding in his bones and joints.  (R. at 277.)  Dr.

---

[1]  The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

Wadnerkar noted that Plaintiff had diabetes. (R. at 277.) On August 9, 2011, Plaintiff visited John Strunk, M.D. at South Hill Internal Medicine and Critical Care, P.C., complaining of edema in both feet. (R. at 256.) Dr. Strunk ordered an arterial doppler ultrasound, discontinued Gabapentin and Indocin, and prescribed Prednisone. (R. at 258.) On August 19, 2011, Plaintiff underwent an arterial doppler ultrasound that revealed severe decrease of his ankle-brachial index ("ABI") levels in his right ankle and moderately decreased left ABI levels in his left ankle. (R. at 266.) The ultrasound indicated severe multilevel obstructive disease in the arteries of his right lower extremity and moderate multilevel obstructive disease in the arteries of his left lower extremity. (R. at 266.)

On August 24, 2011, Plaintiff was admitted to MCV Hospital. (R. at 351-55.) Joanne Hudson, M.D. at MCV Hospital conducted Plaintiff's examination, which revealed severe right leg occlusive disease with popliteal occlusion, superficial femoral artery stenosis and single vessel peroneal artery runoff. (R. at 352.) Plaintiff underwent a right below-the-knee amputation. (R. at 351-55.)

On September 13, 2011, Plaintiff visited Anita Rogers, P.A. at Rural Health Group at Norlina ("Rural"), complaining of swelling and pain at his amputation site. (R. at 319.) Ms. Rogers observed that Plaintiff appeared alert and oriented with no acute distress. (R. at 319.) Plaintiff's right lower extremity seeped sero-sanguinous fluid and the skin around the staples appeared to slough off. (R. at 319.) Plaintiff noted that despite continued leg pain, medication helped. (R. at 319.) Ms. Rogers advised Plaintiff that he needed to be hospitalized to undergo a transfusion, along with an evaluation of his white blood count with thrombocytosis secondary to arterial embolism. (R. at 321.)

On September 14, 2011, Plaintiff was admitted to Halifax Regional Medical Center. (R. at 295-97.) Plaintiff complained of weakness and explained that he had a history of insulin-dependent diabetes mellitus and hypertension. (R. at 295.) Plaintiff stated that he developed acute renal failure, but he did not require any more dialysis treatments. (R. at 295.) Tochukwu Agbata, M.D. examined Plaintiff and assessed that Plaintiff suffered acute anemia, diabetes mellitus, accelerated hypertension and acute arterial emoboli in his right lower extremity. (R. at 297.) Dr. Agbata completed the blood transfusion and subsequent evaluations. (R. at 297.) On September 17, 2011, Dr. Agbata discharged Plaintiff. (R. at 292.) Dr. Agbata diagnosed Plaintiff with acute iron-deficiency anemia, moderate diffuse gastritis, diabetes mellitus, accelerated hypertension, acute arterial emboli and a urinary tract infection. (R. at 292.) Dr. Agbata noted that upon discharge, Plaintiff appeared in no distress and remained in stable condition. (R. at 293.) Dr. Agbata instructed Plaintiff to follow-up with Ms. Rogers to document his blood sugars two times per day. (R. at 293.)

On September 26, 2011, Plaintiff followed-up with Ms. Rogers and received treatment and an eye examination. (R. at 315.) Although Plaintiff's amputation site did not appear to be in a good condition, there were no signs of infection. (R. at 315.) Plaintiff complained of bowel incontinence; however, Ms. Rogers observed that Plaintiff had normal bowel sounds and was not in acute distress. (R. at 315-16.)

On October 27, 2011, Plaintiff underwent a second amputation of his right leg, because the prior amputation was determined to be non-healing. (R. at 340-41.) Sasa-Grae Muyco Espino, M.D. performed the surgery at MCV Hospital. (R. at 340-41.) On November 30, 2011, Plaintiff followed-up with Ms. Rogers and stated that he no longer experienced pain in his right leg. (R. at 497.) Plaintiff also noted that he participated in physical therapy and soon would be

4

fitted for his prosthesis. (R. at 497.) Ms. Rogers observed that he appeared in no acute distress and looked comfortable, alert and oriented, maintained a regular heart rate and his lungs remained clear. (R. at 497.) Plaintiff used a wheelchair for mobility. (R. at 497.) Ms. Rogers diagnosed Plaintiff with benign hypertension and prescribed Lotrel and Hytrin. (R. at 497-98.)

On December 1, 2011, Plaintiff followed-up at MCV Hospital after his amputation. (R. at 444-45.) Francisco C. Albuquerque, M.D. examined Plaintiff and observed that Plaintiff had a palpable right femoral pulse, while his above-the-knee amputation stump remained clean with intact staples and showed no drainage. (R. at 444.) Plaintiff denied any pain or drainage in his right leg and noted that he felt increased strength in his right lower extremity. (R. at 444.) Dr. Albuquerque opined that Plaintiff had progressed well and discharged him. (R. at 444.) Dr. Albuquerque strongly advised Plaintiff against tobacco use and instructed him to follow-up with occupational therapy for his prosthetic placement. (R. at 444.) On December 8, 2011, Plaintiff returned to MCV Hospital for follow-up and complained that he had trouble walking. (R. at 457-59.) Plaintiff stated that "everything is going good." (R. at 457.) Plaintiff reported being independent at home and indicated that he cooked for himself, used a walker and experienced no leg pain. (R. at 457.) Plaintiff's examination revealed that he could not ambulate at the time. (R. at 458.) However, he appeared in no acute distress, maintained clear lungs and a regular heart rate, and demonstrated full strength in his right hip. (R. at 458.) His leg had also healed well. (R. at 458.) Plaintiff was encouraged to use his walker more at home. (R. at 459.)

On December 21, 2011, Plaintiff presented at Community Memorial Health Center, complaining of shortness of breath and a new onset of congestive heart failure. (R. at 461-63.) Plaintiff explained that he had no chest pains and did not know how well he controlled his diabetes. (R. at 461.) Christopher J. Ackerman, M.D. examined Plaintiff and noted that his

oxygen saturation improved to one hundred percent and that his air movement improved with no wheezing after the initial therapy. (R. at 462.) Dr. Ackerman admitted Plaintiff to the intensive care unit for treatment of congestive heart failure, which was most likely a result of Plaintiff's underlying vascular disease, hypertensive heart disease and diabetes. (R. at 462.) Dr. Ackerman ordered that Plaintiff undergo arterial venous doppler studies, an echocardiogram and a cardiology consultation. (R. at 463.) Further, Dr. Ackerman instructed Plaintiff to maintain tight diabetic control. (R. at 462.) On December 24, 2011, Dr. Ackerman discharged Plaintiff and diagnosed him with congestive heart failure due to hypertension. (R. at 467.) Dr. Ackerman noted that Plaintiff's examinations revealed no hydronephrosis or myocardial infarction, showed favorable hemoglobin A1C and that his chest x-ray demonstrated clearing. (R. at 467.) Further, Dr. Ackerman counseled Plaintiff on the importance of maintaining a strict, sodium-restricted diet, prescribed several medications and instructed Plaintiff to monitor his weight. (R. at 467.)

On January 11, 2012, Plaintiff followed-up with Ms. Rogers. (R. at 493-96.) Plaintiff reported experiencing no pain, denied any diabetic symptoms and had no complaints. (R. at 493.) Plaintiff explained that he continued to eat fried food and fast food every other day because of convenience. (R. at 493.) Ms. Rogers noted that Plaintiff appeared comfortable and in no acute distress, and that he maintained a regular heart rate and clear lungs. (R. at 494.) Also, he showed signs of edema in his right lower extremity, while his left lower extremity to the knee remained firm with sclerotic feeling due to pressure from fluid. (R. at 494.) On February 8, 2012, Plaintiff followed-up with Ms. Rogers and reported no symptoms, had no complaints and was doing well. (R. at 490.) Plaintiff denied any chest pain, shortness of breath or orthopnea. (R. at 490.) Plaintiff's examination revealed that Plaintiff remained comfortable and

in no acute distress, in addition to maintaining a regular heart rate and clear lungs. (R. at 491.) He appeared alert and well-oriented, and used a wheelchair for mobility. (R. at 491.)

On April 13, 2012, Plaintiff visited Tariq Abo-Kamil, M.D. at Maria Parham Nephrology and Hypertension Clinic. (R. at 556-58.) Plaintiff received treatment for his chronic kidney disease ("CKD")-stage III/IV and hyperkalemia. (R. at 556.) Plaintiff stated that he felt well and denied shortness of breath, chest pain, fever and fatigue. (R. at 556.) Dr. Kamil noted that Plaintiff used a wheelchair, but appeared in no distress. (R. at 557.) Plaintiff's examination revealed that his ocular muscles were intact, he maintained good air movement and showed no signs of edema in his extremities. (R. at 557.) Dr. Kamil diagnosed Plaintiff with CKD-stage III/IV, hyperpotassemia, hypertension and diabetes. (R. at 557-58.) Dr. Kamil counseled Plaintiff on treatment plans and reviewed tests and labs. (R. at 558.)

On April 25, 2012, Plaintiff followed-up with Dr. Kamil and reported that he was doing well and denied fever, shortness of breath, chest pain, nausea or fatigue. (R. at 553.) Dr. Kamil observed that Plaintiff used a wheelchair, but appeared in no distress. (R. at 554.) Plaintiff's examination revealed that his ocular muscles remained intact, his heart and lungs were normal and he showed no signs of edema in his extremities. (R. at 557.)

On July 25, 2012, Plaintiff reported that he felt well and denied any fever, shortness of breath, chest pain or fatigue. (R. at 550.) Dr. Kamil noted that Plaintiff used a wheelchair, but appeared in no distress. (R. at 551.) Plaintiff's examination revealed that his ocular muscles remained intact, his heart and lungs were normal, and he showed no signs of edema in his extremities. (R. at 551.)

On October 31, 2012, Plaintiff reported that he felt well and denied any fever, shortness of breath, chest pain or fatigue. (R. at 547.) Plaintiff used a wheelchair, but appeared in no

distress. (R. at 548.) Plaintiff's ocular muscles remained intact, his heart and lungs were normal, but he demonstrated some edema present in his right lower extremity. (R. at 548.) Dr. Kamil diagnosed Plaintiff with hypertension, CKD-stage III/IV, proteinuria and diabetes. (R. at 548-49.)

On December 3, 2012, Plaintiff followed-up with Justin M. Johnson, PA-C at Rural for his diabetes and hypertension. (R. at 572-76.) Plaintiff reported doing well and had no complaints. (R. at 572.) Plaintiff had received his prosthetic leg and participated in physical therapy. (R. at 572.) Mr. Johnson noted that Plaintiff's hypertensive symptoms improved and that Plaintiff had no complaints. (R. at 572.) Plaintiff denied fatigue, chest pain, shortness of breath, leg edema, orthoponea, syncope and heart palpitations. (R. at 572.) Plaintiff stated that he used tobacco, but wanted to quit. (R. at 573.) Upon examination, Plaintiff appeared comfortable and in no acute distress, showed regular heart rate and clear lungs, used a wheelchair for mobility and remained alert and well-oriented. (R. at 574.) Mr. Johnson assessed that Plaintiff had insulin-dependent diabetes mellitus, hypertension and CKD-stage III. (R. at 574.)

On February 12, 2013, Plaintiff followed-up with Dr. Kamil. (R. at 544-46.) Plaintiff stated that he felt well and denied shortness of breath, chest pain or fatigue. (R. at 544.) Dr. Kamil noted that Plaintiff used a wheelchair, but appeared in no distress. (R. at 545.) Plaintiff's examination yielded largely normal results, but he showed some edema in his lower right extremity. (R. at 545.) Dr. Kamil counseled Plaintiff on maintaining a low-sodium diet. (R. at 545.)

On March 4, 2013, Plaintiff visited Nicholas Bixler, O.D. at Commonwealth Eye Care Associates for a diabetes examination. (R. at 588-89.) Dr. Bixler's examination revealed that

Plaintiff had diabetes mellitus with proliferative diabetic retinopathy. (R. at 588.) Plaintiff's eye examination revealed that he had 20/30 vision in his right eye and 20/400 vision in his left eye. (R. at 588.) Dr. Bixler discussed glycemic control, arranged for a vitreo-retinal consultation and instructed Plaintiff to follow-up in one year. (R. at 588.)

On March 27, 2013, Plaintiff followed-up with Mr. Johnson regarding his hypertension and diabetes. (R. at 566-70.) Plaintiff indicated that he was doing well and had no complaints. (R. at 566.) Plaintiff denied fatigue, chest pain, shortness of breath and leg edema. (R. at 566-67.) Mr. Johnson noted that Plaintiff's hypertensive symptoms had improved. (R. at 566.) Plaintiff stated that he exercised at physical therapy. (R. at 566.) Plaintiff appeared in no acute distress, maintained a normal heart rate and rhythm, showed no signs of edema in his left lower extremity and used a walker for mobility. (R. at 568.)

On May 22, 2013, Plaintiff followed-up with Dr. Kamil. (R. at 541-43.) Plaintiff reported that he felt well and denied shortness of breath, chest pain or fatigue. (R. at 541.) Dr. Kamil noted that Plaintiff used a wheelchair, but appeared in no distress. (R. at 542.) Plaintiff's examination revealed that his ocular muscles remained intact, he maintained normal heart and clear lungs, and he showed some edema in his lower right extremity. (R. at 542.) He appeared alert and well-oriented with his cranial nerves intact. (R. at 542.) Dr. Kamil diagnosed Plaintiff with hypertension, CKD-stage III/IV, proteinuria and diabetes. (R. at 542-43.) Dr. Kamil increased Plaintiff's hydralazine prescription to 100 mg twice per day and counseled Plaintiff on the importance of controlling his blood sugar and avoiding nephrotoxic agents to control his diabetes. (R. at 542-43.)

On June 3, 2013, Plaintiff returned to Dr. Bixler regarding his diabetic retinopathy. (R. at 586.) Plaintiff maintained 20/25 vision in his right eye and 20/400 in his left eye. (R. at 586.)

Dr. Bixler opined that Plaintiff had diabetes mellitus with proliferative diabetic retinopathy. (R. at 586.) Dr. Bixler counseled Plaintiff on the glycemic control and recommended that Plaintiff update his spectacles. (R. at 586.) On June 26, 2013, Plaintiff followed-up with PA-C Johnson for his diabetes and hypertension. (R. at 559-65.) Plaintiff reported that his diabetic and hypertensive symptoms were better and that he had no complaints. (R. at 559.) Plaintiff denied fatigue, chest pain, shortness of breath and leg edema. (R. at 559-60.) PA-C Johnson observed that Plaintiff appeared in no distress, maintained regular heart rate and rhythm, had no edema in his left leg, used a walker for mobility and remained alert and well-oriented. (R. at 561.) PA-C Johnson assessed that Plaintiff had type-II diabetes, hypertension, CKD-stage III and bilateral impacted cerumen. (R. at 561.) PA-C Johnson continued Plaintiff on his medication regimen. (R. at 561-65.) On July 5, 2013, Plaintiff underwent a repeat eye examination and maintained 20/25 vision in his right eye and 20/400 vision in his left eye. (R. at 584.)

C. State Agency Physicians

On January 4, 2012, J. Astruc, M.D., a state agency physician, reviewed Plaintiff's medical records and completed a Disability Determination Explanation. (R. at 58-60, 67-68.) Dr. Astruc concluded that Plaintiff had the severe medically determinable impairments ("MDIs") of amputations, peripheral vascular (arterial) disease, diabetes mellitus and hypertension. (R. at 58.) He opined that Plaintiff's impairments could reasonably be expected to produce his pain and other symptoms, and that the objective medical evidence substantiated Plaintiff's statements about the intensity, persistence and functional limiting effects of his symptoms. (R. at 59.) Dr. Astruc determined that Plaintiff had exertional limitations due to his right above-the-knee amputation. (R. at 59-60.) Plaintiff could carry twenty pounds occasionally and ten pounds frequently, and could sit, stand or walk for six hours in an eight-hour workday with normal

breaks. (R. at 59.) Plaintiff's ability to push or pull, including the operation of hand or foot controls, was unlimited. (R. at 59.)

Dr. Astruc further determined that Plaintiff had postural limitations due to his right above-the-knee amputation. (R. at 60.) He could occasionally climb ramps and stairs, balance and stoop, but never climb ladders, ropes or scaffolds, kneel, crouch, or crawl. (R. at 60.) Plaintiff had no manipulative, visual, communicative or environmental limitations. (R. at 60.) Based on these considerations, Dr. Astruc concluded that Plaintiff could perform his past relevant work as a cashier checker. (R. at 61-62.)

On March 15, 2012, David C. Williams, M.D., a state agency physician, completed a Disability Determination Explanation for reconsideration. (R. at 80-83, 91-93.) Dr. Williams determined that Plaintiff had severe MDIs of amputations, peripheral vascular (arterial) disease, diabetes mellitus and hypertension. (R. at 80.) He concluded that Plaintiff's MDIs could reasonably be expected to produce his pain or other symptoms. (R. at 80.) However, Dr. Williams opined that Plaintiff's statements about the persistence, severity and functional limitations of his symptoms were only partially credible. (R. at 80-81.)

Dr. Williams assessed Plaintiff as having exertional limitations due to above-the-knee amputation, insulin-dependent diabetes, hypertension and congestive heart failure. (R. at 81.) Dr. Williams determined that Plaintiff had the ability to lift twenty pounds occasionally and ten pounds frequently, and could sit, stand or walk for approximately six hours in an eight-hour workday with normal breaks. (R. at 81.) Plaintiff's postural limitations included the ability to occasionally climb ramps and stairs, balance and stoop, and never climb ladders, ropes or scaffolds, kneel, crouch or crawl. (R. at 81-82.) Dr. Williams assessed no manipulative, visual or communicative limitations. (R. at 82.) Plaintiff had to avoid concentrated exposure of fumes,

11

odors, dusts, gases, poor ventilation and avoid even moderate exposure to hazards.  (R. at 82.)

Dr. Williams determined that Plaintiff could have unlimited exposure to wetness, humidity,

noise, vibration, extreme heat and extreme cold.  (R. at 82.)  Dr. Williams determined that

Plaintiff was capable of performing light work.  (R. at 83-84.)

     D.  Function Report

On February 15, 2012, Plaintiff completed a function report.  (R. at 216-23.)  He stated

that he lived in a house with his brother.  (R. at 216.)  His typical day entailed waking up, taking

a bath with assistance, fixing food, sitting or lying down, watching television and exercising with

help.  (R. at 216.)  Plaintiff indicated that his condition affected his sleep.  (R. at 217.)  Plaintiff

needed help dressing, bathing and getting on the toilet.  (R. at 217.)  He needed special reminders

to bathe, brush his teeth and take his medication.  (R. at 218.)

Plaintiff did not prepare his own meals, but indicated that his cooking habits had not

changed after the onset of his conditions.  (R. at 218.)  He completed no house or yard work.  (R.

at 218-19.)  Plaintiff went outside at least once per month.  (R. at 219.)  When he went out, he

rode in a car.  (R. at 219.)  Plaintiff noted that he could not go out alone, because he could not

drive and used a wheelchair after his right leg amputation.  (R. at 219.)  Plaintiff did not shop.

(R. at 219.)  Plaintiff could count change, but indicated that he did not feel comfortable paying

bills, handling a savings account or using a checkbook or money order.  (R. at 219-20.)

Plaintiff indicated that he had no hobbies or interests.  (R. at 220.)  Plaintiff spent time

with his family at home, and would eat and watch television with them approximately two to

three times per week.  (R. at 220.)  He indicated that he had problems getting along with others at

times, because he did not want to be bothered.  (R. at 221.)  Plaintiff reported that he went to

doctors' appointments once per month and needed someone to accompany him.  (R. at 220.)

Plaintiff did not handle stress or changes in routine well. (R. at 222.) Plaintiff reported that he could pay attention for approximately thirty to forty-five minutes. (R. at 221.) He did not follow written or spoken instructions well, but noted that he followed instructions approximately half of the time. (R. at 221.) His condition affected his ability to lift, squat, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, understand, follow instructions, get along with others and his memory. (R. at 221.) Plaintiff reported that he could lift approximately twenty-five pounds and could not walk because of his amputation. (R. at 221.) Plaintiff required the use of either his prescribed wheelchair or a walker. (R. at 222.)

E.  Plaintiff's Testimony

On September 3, 2013, Plaintiff (represented by counsel) testified during a hearing held before the ALJ. (R. at 31-54.) Plaintiff was thirty years old, graduated high school and earned his CDL. (R. at 32-33.) Plaintiff previously worked as a paraprofessional at a group home, assisting adults who had mental illness with basic living needs. (R. at 34.) Plaintiff stated that he rarely went out, but when he did, he visited his doctors or attended church. (R. at 38.) Plaintiff lived with his brother and mother. (R. at 39.) Plaintiff's brother assisted him around the house and washed his clothes, prepared meals and cleaned. (R. at 39.) Plaintiff's mother also cooked meals, bought groceries and drove him around. (R. at 39.) Plaintiff testified that he cared for his personal needs without help and used a shower chair to bathe. (R. at 40.)

Plaintiff testified that he had a prosthetic leg and walker that he used when he went out, but that he used his wheelchair eighty-five percent of the time. (R. at 34-35.) Plaintiff testified that his prosthetic leg irritated the skin around his groin and he sometimes experienced phantom pain in the stump. (R. at 40.) Plaintiff could wear the prosthetic for two or three hours before it irritated him or started to ache, but he put it on every morning and throughout the day. (R. at

13

44.) He noted that it did not cause unbearable pain, but felt uncomfortable. (R. at 44.) Plaintiff regularly used his prosthetic and walker when he went to doctor's appointments. (R. at 45.)

Plaintiff testified that his blood sugars were controlled with insulin and remained stable. (R. at 41.) He indicated that when his blood pressure spiked, he experienced headaches or slightly blurred vision. (R. at 41-42.) Plaintiff explained that his kidney function dropped to twenty-six percent and he had congestive heart failure that caused fatigue. (R. at 42.) Plaintiff denied any tingling or numbing in his hands, and he had no problems reaching, grasping or handling objects. (R. at 42.) Plaintiff stated that he could lift and move small objects while in the wheelchair, but could not while he used a walker. (R. at 42.) Plaintiff denied experiencing any side effects from his medications, but noted that he needed to use the bathroom frequently, so he limited his fluid intake. (R. at 43.) Plaintiff stated that a typical day included watching television or visiting with friends and family. (R. at 43.)

Plaintiff testified that he recently underwent laser surgery on his right eye and scheduled laser surgery on his left eye. (R. at 48.) However, he could only see out of his right eye until he had laser surgery completed on his left eye. (R. at 48-49.)

F.  Vocational Expert Testimony

During the September 3, 2013 hearing, a VE also testified. (R. at 47-54.) The VE testified that Plaintiff's previous job as a sales clerk constituted semi-skilled, light exertional work, and his previous job as a group home aide classified as semi-skilled, medium exertional work. (R. at 48.) The ALJ asked the VE if a hypothetical person of the same age, education and work experience as Plaintiff, who was limited to sedentary work, could occasionally climb ramps or stairs, balance and stoop, could never climb ladders, ropes or scaffolds, kneel, crouch or crawl, could occasionally be exposed to fumes, odors, dust, gases, poorly ventilated areas, but

14

could never be exposed to unprotected heights or hazardous machinery, and was limited to occupations that did not require peripheral acuity or binocular vision, could perform Plaintiff's past relevant work. (R. at 49.) The VE stated that such a person could perform Plaintiff's past relevant work as a retail sales clerk, which constituted semi-skilled work at the sedentary exertion level. (R. at 49.)

The VE explained that other jobs existed in the national economy that Plaintiff could perform at the semi-skilled, sedentary exertion level, including as a telephone solicitor with 240,000 jobs in the national economy and 3,800 jobs in Virginia, as a cashier with over 106,000 jobs in the national economy and 2,900 jobs in Virginia, as an order clerk with 75,000 jobs in the national economy and 1,300 jobs in Virginia, as an inspector, a sorter or a grader with 31,000 jobs in the national economy and 900 jobs in Virginia, and as an assembler with 43,000 jobs in the national economy and 1,100 jobs in Virginia. (R. at 50-51.) The VE further explained that these jobs could accommodate an individual who required the use of a cane or walker throughout the day, because the work is completed sitting down, so long as the individual could get to and from work. (R. at 51.) The ALJ next asked whether an individual who required use of the restroom at least once hourly during the workday could still perform work in the national economy. (R. at 52.) The VE testified that there would not be competitive employment for such an individual. (R. at 52.)

## II.   PROCEDURAL HISTORY

On October 28, 2011, Plaintiff filed for DIB and SSI, with an alleged onset date of August 24, 2011. (R. at 55-70, 198.) Plaintiff sought disability due to diabetes, hypertension and above-the-knee amputation of his right leg. (R. at 55-70, 198.) Plaintiff's claims were denied initially on January 4, 2012, and upon reconsideration on March 15, 2012. (R. at 71-74.)

15

On September 3, 2013, Plaintiff (represented by counsel) testified before the ALJ during a hearing. (R. at 31-49.) On October 18, 2013, the ALJ issued a written decision denying Plaintiff's claims. (R. at 15-28.) On November 10, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court. (R. at 1.)

## III.   QUESTIONS PRESENTED

1.  Did the ALJ err in finding that Plaintiff's condition failed to meet listing § 1.05B?

2.  Did the ALJ err in assigning great weight to the state agency physicians' opinions?

3.  Did the ALJ err in assessing Plaintiff's RFC?

4.  Did the ALJ err in failing to obtain an updated consultative examination?

## IV.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts

16

from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings

as to any fact, if substantial evidence in the record supports the findings, are conclusive and must

be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*,

667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination

or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*,

829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine

if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d

171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that

process that a court must examine on appeal to determine whether the correct legal standards

were applied, and whether substantial evidence in the record supports the resulting decision of

the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the

time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and

gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity

is "work activity that involves doing significant physical or mental activities. Your work may be

substantial even if it is done on a part-time basis or if you do less, get paid less, or have less

responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is

work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R.

§ 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school

attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R.

§ 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[2] based on an assessment of the claimant's RFC[3] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the

---

[2]    Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[3]    RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472. However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel,* 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert,* 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## V.   ANALYSIS

A. The ALJ's Decision.

On September 3, 2013, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 31-54.) On October 18, 2013, the ALJ issued a written decision finding that Plaintiff was not disabled under the Act. (R. at 15-28.) The ALJ followed the five-step sequential evaluation as established by the Act in analyzing whether Plaintiff was disabled. (R. at 16-28.)

At step one, the ALJ found that Plaintiff had not engaged in SGA since his alleged onset date. (R. at 17.) At step two, the ALJ determined that Plaintiff suffered from the severe impairments of right lower extremity above-the-knee amputation, peripheral vascular disease, diabetes mellitus, hypertension, left eye vision impairment, obesity and CKD. (R. at 17.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) The ALJ further determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the limitations that he only occasionally balance, stoop and climb ladders and stairs, but never kneel, crouch, crawl or climb ladders, ropes and scaffolds. (R. at 19.) Additional limitations included the need to avoid exposure to hazards and have no more than occasional exposure to irritants, and he is also limited to occupations not requiring peripheral acuity or binocular vision. (R. at 19.)

At step four, the ALJ concluded that Plaintiff could not perform any of his past relevant work as a group home aide or a retail sales clerk. (R. at 26.) Finally, at step five, based upon Plaintiff's age, education, work experience and RFC, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 27.) Accordingly, the ALJ found that Plaintiff was not disabled under the Act. (R. at 27-28.)

Plaintiff challenges the ALJ's decision on several grounds. First, Plaintiff argues that the ALJ erred in finding that Plaintiff's condition failed to meet listing § 1.05B. (Mem. [sic] of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 14) at 19-21.) Second, Plaintiff claims that the ALJ erred in assigning great weight to the state agency physicians' opinions. (Pl.'s Mem. at 21-24.) Third, Plaintiff asserts that the ALJ erred in assessing Plaintiff's RFC.

(Pl.'s Mem. at 25-26.) Finally, Plaintiff argues that the ALJ failed to obtain an updated consultative examination. (Pl.'s Mem. at 26-27.)

      B. The ALJ did not err in determining that Plaintiff did not meet the requirements of listing § 1.05B.

Plaintiff argues that the ALJ erred in finding that Plaintiff's condition did not meet listing § 1.05B for a physical disability, because the ALJ failed to follow prescribed procedures to determine whether all of Plaintiff's impairments equaled a listed impairment. (Pl.'s Mem. at 19-21.) Defendant maintains that substantial evidence supports the ALJ's finding that Plaintiff did not medically equal § 1.05B. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 15) at 13-15.)

Plaintiff bears the burden of proving that he meets or equals a listing. *Yuckert*, 482 U.S. at 146 n.5. The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530.

To meet listing § 1.05B, Plaintiff's condition must satisfy all of the listing's enumerated criteria. *Zebley*, 493 U.S. at 350. Specifically, Plaintiff must demonstrate here that:

> One or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b,[4] which have lasted or are expected to last for at least 12 months.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.05B.

---

[4]    Section 1.00B2b defines an inability to effectively ambulate as "an extreme limitation of the ability to walk . . . [with] insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpart P, Appendix 1, § 1.00B2b1.

In this case, the ALJ found that Plaintiff had the severe impairments of right lower extremity above-the-knee amputation, peripheral vascular disease, diabetes mellitus, hypertension, left eye vision impairment, obesity and CKD. (R. at 17.) The ALJ found that Plaintiff's condition did not meet listing § 1.05B. (R. at 18-19.) The ALJ determined that the medical evidence did not show that Plaintiff suffered stump complications resulting in a medical inability to use a prosthetic device to ambulate effectively.[5] (R. at 18.)

Substantial evidence supports the ALJ's determination that Plaintiff did not meet listing § 1.05B on the basis that Plaintiff did not demonstrate his inability to use a prosthetic device to ambulate effectively. Further, substantial evidence supports the ALJ's conclusion that Plaintiff's hypertension, CKD and diabetes mellitus failed to meet or equal the listings. On August 24, 2011, Plaintiff underwent a below-the-knee right leg amputation to treat his ischemic leg after he fell in his house. (R. at 274, 277, 351-55.) On September 9, 2011, Plaintiff complained of discomfort and pain following his amputation. (R. at 323-25.) P.A. Rogers opined that the staples appeared in place and the stump healed well. (R. at 325.) On September 13, 2011, Plaintiff complained of continued leg pain and weakness. (R. at 319.) However, Plaintiff reported that medications helped. (R. at 319.) Ms. Rogers observed that Plaintiff's right stump

---

[5]     The ALJ further determined that Plaintiff's other alleged conditions did not meet the Listings requirements. Plaintiff only challenges the ALJ's conclusion that Plaintiff did not meet listing § 1.05B on the basis that Plaintiff did not demonstrate his inability to use a prosthetic device to ambulate effectively. (Pl.'s Mem. at 19-21.) However, the ALJ also concluded that Plaintiff's hypertension had not resulted in symptoms or limitations that met or equaled listing § 4.00H1. (R. at 18-19.) Further, the ALJ assessed that Plaintiff's condition did not meet listing § 6.02. (R. at 18-19.) The ALJ found that the medical evidence failed to show that Plaintiff's CKD rose to an elevated level of serum creatinine to 4 mg per deciliter (dL) (100ml) or greater or reduction of creatinine clearance to 20 ml per minute or less over at least three months. (R. at 19.) Lastly, the ALJ determined that Plaintiff's condition failed to meet listing § 9.00. (R. at 18-19.) The ALJ concluded that Plaintiff's diabetes mellitus had not resulted in symptoms or limitations that caused him to meet or equal the listings concerning any other body systems. (R. at 19.)

seeped sero-sanguinous fluid and the skin around the staples sloughed off and appeared to be a dusky gray color. (R. at 319.)

On October 27, 2011, Plaintiff underwent a second amputation of his right leg after his previous amputation was non-healing. (R. at 340-41.) On November 30, 2011, Plaintiff followed-up with Ms. Rogers and indicated that he experienced no pain in his right leg after the second amputation. (R. at 497.) Plaintiff also discussed his physical therapy and noted that he would be fitted for his prosthesis. (R. at 497.) P.A. Rogers observed that Plaintiff used a wheelchair for mobility, but he appeared in no acute distress and looked comfortable. (R. at 497.)

On December 1, 2011, Dr. Albuquerque conducted a follow-up examination of Plaintiff's amputation and determined that Plaintiff had a palpable right femoral pulse, and that his below-the-knee amputation stump remained clean with intact staples and no drainage. (R. at 444.) Plaintiff denied any pain or drainage in his right leg and stated that he felt increased strength in his right lower extremity. (R. at 444.) Dr. Albuquerque opined that Plaintiff showed good progress and instructed him to follow-up in occupational therapy for his prosthetic placement. (R. at 444.)

On December 8, 2011, although Plaintiff complained of trouble walking, he reported that "[e]verything is going good." (R. at 457.) Notably, Plaintiff discussed being independent at home and that he cooked for himself, used a walker and experienced no leg pain. (R. at 457.) At that time, Plaintiff could not ambulate, but his leg wound healed properly and he maintained full strength in his right hip. (R. at 458.) Plaintiff was encouraged to use his prosthetic and walker more frequently. (R. at 459.)

On December 21, 2011, Plaintiff was admitted into the Community Memorial Health Center, complaining of shortness of breath and onset congestive heart failure. (R. at 461-63.) Dr. Ackerman observed that Plaintiff's oxygen saturation improved to one-hundred percent and noted that Plaintiff's air movement improved with no wheezing after initial therapy. (R. at 462.) On December 24, 2011, Dr. Ackerman discharged Plaintiff and diagnosed him with congestive heart failure due to hypertension, but noted that Plaintiff's examinations showed no hydronephrosis or myocardial infarction and that his chest x-ray demonstrated clearing. (R. at 467.) Dr. Ackerman counseled Plaintiff on the importance of maintaining a strict, sodium-restricted diet and discussed weight maintenance. (R. at 467.)

In January and February 2012, Plaintiff discussed with Ms. Rogers that he continued to eat fried food and fast food every other day. (R. at 493.) Plaintiff reported no pain, denied any diabetes symptoms or other complaints, and stated that he was doing well. (R. at 490-91, 493-94.) In April and July 2012, Dr. Kamil treated Plaintiff for CKD. (R. at 556.) During the examination, Plaintiff stated that he felt good and denied shortness of breath, chest pain, fever and fatigue. (R. at 556.) Dr. Kamil observed that Plaintiff's ocular muscles were intact and he showed no signs of edema in his extremities. (R. at 550-51, 553-54, 557.) On October 31, 2012, Plaintiff reported feeling good and denied any fever, shortness of breath, chest pain or fatigue. (R. at 547.) Dr. Kamil observed that Plaintiff used a wheelchair, but appeared in no distress, his ocular muscles remained intact, his heart and lungs were normal, and he demonstrated some edema in his right lower extremity. (R. at 548.)

On December 3, 2012, Plaintiff followed-up with Mr. Johnson and reported that his hypertensive symptoms were controlled and he had no complaints. (R. at 572.) Plaintiff discussed his physical therapy and that he received his prosthetic leg. (R. at 572.) On February

24

12, 2013, Dr. Kamil concluded that Plaintiff's examination yielded largely normal results, but he showed some edema in his lower right extremity. (R. at 545.) On March 27, 2013, Plaintiff stated that he participated in exercise at physical therapy and used his prosthetic leg and walker for mobility. (R. at 566, 568.) Mr. Johnson concluded that Plaintiff's hypertension symptoms were better and he showed no signs of edema. (R. at 566, 568.) On June 26, 2013, during a follow-up appointment with Mr. Johnson, Plaintiff explained that his diabetes and hypertension symptoms were better and that he had no complaints. (R. at 559.)

Plaintiff's own statements provide further support for the ALJ's decision. Plaintiff indicated that he fixed food, exercised with some help and could lift approximately twenty-five pounds. (R. at 216, 221.) Plaintiff testified that he used his prosthetic leg and walker when he went out. (R. at 34-35.) Plaintiff noted that his prosthetic irritated the skin around his groin and he sometimes experienced phantom pain in his stump, but noted that it did not cause unbearable pain and merely felt uncomfortable. (R. at 44.) Plaintiff testified that he regularly used his prosthetic and walker when he went to doctors' appointments and that he put it on every morning and used it throughout the day. (R. at 44.) Plaintiff testified that his blood sugars were controlled with insulin and remained stable. (R. at 41.) Plaintiff explained that his kidney function decreased, but denied any side effects from his medications. (R. at 42.) Because the evidence submitted by Plaintiff and considered by the ALJ does not demonstrate Plaintiff's inability to ambulate effectively with his prosthetic device, the ALJ did not err in finding that Plaintiff lacked an impairment or a combination of impairments that meets or medically equals the severity of the listed impairments in § 1.05B.

C.  The ALJ did not err in assigning great weight to the state agency physicians' opinions.

Plaintiff argues that the ALJ erred in affording great weight to the state agency physicians' opinions. (Pl.'s Mem. at 21-24.) Defendant responds that substantial evidence supports the ALJ's determinations. (Def.'s Mem. at 16.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 404.1527, 416.912(a)-(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are internally inconsistent with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). Except when a treating source's opinion is afforded controlling weight, the ALJ must "explain in the decision the weight given to the opinions of a [s]tate agency medical . . . consultant . . . as the [ALJ] must do for any opinions from treating

sources, nontreating sources, and other nonexamining sources." 20 C.F.R. §§ 404.1527(e)(ii), 416.927(e)(ii). Determining the specific weight of medical opinions is especially important, because the regulations further require a comparative analysis of competing medical opinions. *See, e.g.*, 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who examined [Plaintiff] than to the opinion of a source who has not examined [Plaintiff].")

In this case, the ALJ stated that he afforded Dr. Astruc's opinion little weight, because his assessment was made at the initial level and he did not review the evidence received at the hearing level. (R. at 26.) The ALJ assigned Dr. Williams' opinion great weight, because his conclusion on reconsideration of physical and mental functioning was found to be consistent with the medical evidence of record. (R. at 26.) Substantial evidence supports the ALJ's decision.

In this case, the ALJ did not afford a treating source controlling weight. The ALJ acknowledged the expertise of the state agency physicians in evaluating Social Security disability claims such as Plaintiff's, and noted that Dr. Williams determined that Plaintiff was capable of performing a range of light work with additional limitations based on the evidence in the record. (R. at 26.) The ALJ stated that in formulating his opinion, he considered both Dr. Astruc's assessment at the initial level — giving it little weight, and Dr. Williams' assessment at the reconsideration level — assigning it great weight, but that he incorporated additional restrictions beyond those assessed by Dr. Williams into the RFC assessment. (R. at 26.)

Plaintiff's treatment records support the ALJ's determination. On October 27, 2011, Plaintiff underwent a second amputation of his right leg. (R. at 340-41.) On November 30, 2011, Plaintiff followed-up with Ms. Rogers and indicated that he no longer experienced pain in

his right leg. (R. at 497.) Ms. Rogers opined that Plaintiff appeared comfortable and noted that he participated in physical therapy and would soon be fitted for his prosthetic. (R. at 497.) On December 1, 2011, Dr. Albuquerque determined that Plaintiff had a palpable right femoral pulse, his amputation remained clean with intact staples and it showed no drainage. (R. at 444.) Plaintiff admitted that he felt increased strength in his right lower extremity and was doing well. (R. at 444.) Plaintiff denied any pain or draining in his right leg. (R. at 444.) On December 8, 2011, Plaintiff complained that he had trouble walking, but also stated that "[e]verything is going good." (R. at 457.) Plaintiff stated that he cooked for himself and reported being independent at home. (R. at 457.) At the time, Plaintiff could not ambulate, but he used his prosthetic and walker without any pain. (R. at 457.)

Between January and October 2012, Plaintiff repeatedly denied experiencing pain or symptoms from his diabetes or hypertension, reported no complaints and consistently stated that he felt good. (R. at 490, 493, 547, 550-51, 553-54, 556-57.) He routinely appeared comfortable and alert, and his examinations yielded largely normal results. (R. at 490-91, 494, 547-58, 551, 553-54, 556-57.) On December 3, 2012, Plaintiff stated he felt good and had no complaints. (R. at 572.) Plaintiff participated in physical therapy and received his prosthetic leg. (R. at 572.) Plaintiff denied any hypertension symptoms, fatigue, chest pain, shortness of breath, leg edema or heart palpitations, and appeared comfortable and in no distress. (R. at 547.) In February, March, May and June 2013, Plaintiff consistently indicated that he felt good, denied experiencing symptoms of hypertension or diabetes and had no complaints. (R. at 541-42, 544-45, 559-61, 566-67.)

Plaintiff's own statements provide further support for the ALJ's decision. Plaintiff indicated that he prepared food and exercised with help. (R. at 216.) Plaintiff self-reported that

he could pay attention for approximately thirty to forty-five minutes and that he could lift twenty-five pounds. (R. at 221.) Plaintiff testified that he used his prosthetic leg and walker when he went out. (R. at 34-35.) He stated that the prosthetic irritated the skin around his groin, but that he could wear the prosthetic for two to three hours before it irritated him or started to ache. (R. at 44.) Plaintiff testified that the prosthetic caused discomfort or irritation, but noted that it did not cause unbearable pain. (R. at 44.) Further, he stated that he regularly used his prosthetic and walker when he went to doctors' appointments. (R. at 45.) Plaintiff testified that his blood sugars were controlled with insulin and remained stable. (R. at 41.) He denied any tingling or numbing in his hands, and he had no problems reaching, grasping or handling objects. (R. at 42.) Further, Plaintiff denied any side effects from his medications and noted that he recently underwent laser surgery on his right eye and scheduled laser surgery for his left eye. (R. at 43, 48-49.)

    D.  The ALJ did not err in assessing Plaintiff's RFC.

    Plaintiff asserts that the ALJ's assessment of Plaintiff's RFC is unsupported by substantial evidence, because the ALJ failed to include all of Plaintiff's impairments in the RFC. (Pl.'s Mem. at 25-26.) Defendant counters that the ALJ's RFC assessment is supported by substantial evidence. (Def.'s Mem. at 16-18.)

    After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.902(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. § 416.945(b). Generally, the claimant is responsible for providing the evidence that the ALJ utilizes in making

his RFC determination; however, before determining that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. 20 C.F.R. § 416.945(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments that are based on the claimant's credible complaints. *Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* 20 C.F.R. § 416.945(e).

After considering all of Plaintiff's physical and mental impairments, the ALJ found that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.976(b), with additional limitations. (R. at 19.) Specifically, the ALJ concluded that Plaintiff could only occasionally balance, stoop and climb stairs and ramps, but could never kneel, crouch, crawl, or climb ladders, ropes and scaffolds. (R. at 19.) Further, he must avoid exposure to hazards and could have no more than occasional exposure to irritants. (R. at 19.) Finally, Plaintiff was limited to occupations not requiring peripheral acuity or binocular vision. (R. at 19.)

Plaintiff's medical records support the ALJ's RFC assessment. On November 30, 2011, Plaintiff indicated that he no longer experienced pain after his second right leg amputation. (R. at 497.) On December 1, 2011, Dr. Albuquerque determined that Plaintiff had a palpable right femoral pulse, his stump remained clean with intact staples and it showed no drainage. (R. at 444.) Plaintiff also noted that he felt increased strength in his right lower extremity after his second amputation. (R. at 444.) On December 8, 2011, Plaintiff reported being independent at home and indicated that he cooked for himself, used a walker and his prosthetic, and experienced no leg pain. (R. at 457.) Plaintiff's examination revealed that his leg wound healed well and that he maintained full strength in his right hip. (R. at 458.) Plaintiff was encouraged to use his

walker more at home. (R. at 459.) Between December 2011 and June 2013, Plaintiff routinely stated that he felt good, had no complaints, experienced no pain and denied any symptoms. (R. at 490, 493, 527, 541, 544, 547, 550, 556, 559, 566, 572.) Plaintiff's examinations yielded normal results and showed some or no edema in his lower extremities. (R. at 494, 542, 545, 548, 551, 554, 557, 559-60, 561, 566-67, 568, 572.) On March 27, 2013, Plaintiff reported that he participated in exercise at physical therapy and used a walker and his prosthetic for mobility. (R. at 566.)

Plaintiff's own statements further support the ALJ's RFC determination. Plaintiff reported that he fixed food and exercised with some help. (R. at 216.) Plaintiff spent time with his family several times per week and indicated that he could pay attention for approximately thirty to forty-five minutes. (R. at 220-21.) Plaintiff stated that he could lift approximately twenty-five pounds. (R. at 221.) Plaintiff further testified that he used his prosthetic every day and regularly used it when he went out. (R. at 34-35, 44.) Plaintiff noted that although the prosthetic irritated the skin around his groin, he explained that it felt uncomfortable but not unbearably painful. (R. at 40, 44.) Plaintiff testified that his blood sugars were controlled with insulin and remained stable. (R. at 41.) Although Plaintiff stated that his kidney function decreased, he denied any tingling or numbing in his hands and testified that he had no problems reaching, grasping or handling objects. (R. at 42.) Plaintiff denied any side effects from his medications, but noted that he needed to use the bathroom a lot, so he limited his fluid intake throughout the day. (R. at 43.) Plaintiff testified that he recently underwent laser eye surgery on his right eye and scheduled laser surgery on his left eye. (R. at 48-49.) Therefore, substantial evidence supports the ALJ's RFC determination.

E.  The ALJ did not fail to obtain an updated consultative examination.

Plaintiff argues that the ALJ failed to order a consultative examination as required under 20 C.F.R. § 404.1519 to resolve Plaintiff's inconsistent and incomplete medical records, because physicians assigned him varying GAF scores. (Pl.'s Mem. at 23-24.) Defendant counters that substantial evidence supports the ALJ's decision and that the ALJ appropriately determined that a consultative examination was not warranted. (Def.'s Mem. at 17-19.)

Although the ALJ must consider the record as a whole, there is no duty to further develop the record. The need to develop the record is only triggered where there is insufficient or inconsistent evidence. 20 C.F.R. § 404.1520b. Discretion lies with the ALJ to determine whether to further develop the record or seek additional information from medical sources, such as through a consultative exam. 20 C.F.R. § 404.1520b; *Bishop v. Barnhart*, 78 Fed. Appx. 265, 268 (4th Cir. 2003) (unpublished) (finding no error in ALJ's refusal to order a consultative exam because the ALJ has discretion unless the record as a whole is insufficient to support a decision).

Under the applicable regulations, a consultative examination may be obtained the claimant when the record must be further developed to seek additional information or resolve inconsistencies. 20 C.F.R. §§ 404.1519, 416.919a(a). Determinations to obtain a consultative examination are made on an individual basis and in accordance with the provisions set forth in 20 C.F.R. §§ 404.1519a -f, 416.919a-f. The regulations provide that consultative examinations may be sought where the claimant's medical records are insufficient. 20 C.F.R §§ 404.1519a, 416.919a. Further, a consultative examination may be purchased "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim." 20 C.F.R. §§ 404.1519a(b), 416.919a(b). The

Agency may pursue a consultative examination to obtain additional or updated medical evidence, including clinical findings, laboratory tests, a diagnosis or prognosis, where:

> (1) The additional evidence needed is not contained in the records of your medical sources; (2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source; (3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or (4) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

20 C.F.R. §§ 404.1519a(b), 416.919a(b).

In this case, Plaintiff's medical records were consistent and sufficient; thus, the ALJ did not need to order a consultative examination. Plaintiff repeatedly reported to physicians that he experienced no pain, had no complaints and denied any symptoms. (R. at 490, 493, 527, 541, 544, 547, 550, 556, 559, 566, 572.) Plaintiff's examinations consistently yielded normal results and showed some or no edema in his lower extremities. (R. at 494, 542, 545, 548, 551, 554, 557, 559-60, 561, 566-67, 568, 572.) Between November 2011 and March 2013, Plaintiff participated in physical therapy and noted that he exercised during his sessions and used his prosthetic and walker. (R. at 497, 566, 572.) Plaintiff's physicians routinely noted that he appeared alert, well-oriented and in no distress. (R. at 458, 491, 494, 497, 542, 545, 548, 551, 554, 557, 561, 568, 574.)

Plaintiff's own statements support the ALJ's decision. On September 3, 2013, Plaintiff (represented by counsel) testified during a hearing before the ALJ. (R. at 31-54.) Plaintiff indicated that he fixed food and exercised with help. (R. at 216.) Plaintiff self-reported that he could lift approximately twenty-five pounds. (R. at 221.) Plaintiff testified that he cared for his personal needs without help and used a shower chair to bathe. (R. at 40.) He noted that he put his prosthetic on every morning and used it throughout the day. (R. at 44.) Although the

prosthetic caused discomfort around his groin, he explained that it did not cause unbearable pain and that he regularly used it when he went to doctors' appointments. (R. at 44-45.) Further, Plaintiff testified that his blood sugars were controlled with insulin and remained stable. (R. at 41.) He denied any tingling or numbing in his hands, and he had no problems reaching, grasping or handling objects. (R. at 42.) Plaintiff further denied experiencing any side effects from his medications. (R. at 43.) Plaintiff recently underwent laser surgery on his right eye and scheduled laser surgery for his left eye. (R. at 48.) Additionally, the ALJ recommended that Plaintiff supplement the record and left the record open for Plaintiff to submit additional medical records. (R. at 15.) Therefore, substantial evidence in the record supports the ALJ's decision that a consultative examination was not warranted.

## VI.    CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) and Motion for Remand (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Henry E. Hudson with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure**

34

shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____/s/_____
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: _October 9, 2015_